Filing # 119264919 E-Filed 01/07/2021 07:24:16 PM

IN THE CIRCUIT COURT, FOURTH
JUDICIAL DISTRICT IN AND FOR
DUVAL COUNTY, FLORIDA

CASE NO.:

DIVISION:

---

MICHAEL F. TUR, individually
and as Personal Representative of the Estate of
CHRISTOPHER TUR, deceased

ALINE M. BYRNES, individually
and as Personal Representative of the Estate of
CHRISTOPHER TUR, deceased

ANN MARIE TUR, individually

HENRY P. TUR, JR., individually

> *Plaintiffs*

> vs.

JOHN R. NETTLETON
LARA M. SABANOSH;
KELLY WIRFEL

> *Defendants*

_____/

## CIVIL ACTION COMPLAINT

COMES NOW, the Plaintiffs, by and through their undersigned attorneys, and hereby file this complaint against defendants John Nettleton, Lara Sabanosh, and Kelly Wirfel, and alleges as follows:

### INTRODUCTION

1.    On January 8, 2019, defendant Captain John Nettleton was indicted for obstruction of justice and related charges by the U.S. Department of Justice relating to the death of Christopher Tur.

ACCEPTED: DUVAL COUNTY, JODY PHILLIPS, CLERK, 01/08/2021 12:43:39 PM

2.     The indictment for the first time revealed serious misconduct by Nettleton, who at the time of Tur's death in January 2015 was commander of the Guantanamo Bay naval base.

3.     Tur, a civilian employee, had discovered that Nettleton was having an affair with Tur's then wife, Lara Tur (now Lara Sabanosh). Following a violent physical altercation at Nettleton's house on the base, Tur disappeared. Tur's body was discovered floating off the coast several days later.

4.     Tur had been drowned. Before his death he sustained four broken ribs, a deep laceration above one eye, and other injuries.

5.     The indictment spelled out how Nettleton lied about the fight at his house and the affair. Nettleton, who used to be a helicopter pilot trained in search and rescue, deliberately and sedulously led teams searching for Tur away from Nettleton's residence and the surrounding area and water. Nettleton even refused to allow a helicopter to search for Tur's body.

6.     Then, over Nettleton's objections, a ground search team eventually found a paper towel with Tur's blood under the pier on Nettleton's property at around the same time Tur's body was found in the water.

7.     Nettleton had used the time he gained by misleading his superiors and subordinates to clean as much blood as he could from his property. However, some of Tur's blood was recovered from inside Nettleton's house.

8.     Nettleton's trial in January 2020 revealed that when he was read his Miranda rights for suspicion of involvement in the death Chris Tur, he immediately invoked his Fifth Amendment rights and refused to answer any other questions. He also objected to the search of his house.

9.     The indictment also revealed how, following Tur's death, Lara Tur and Nettleton conspired to hide their affair, the fight, destroy evidence, and for years conspired to cover up what really happened.

10.     Nettleton was found guilty in January 2020 of one count of concealment of material facts, two counts of obstruction of justice, one count of falsification of records, and two counts of making false statements. He was sentenced in October 2020 to 2 years in prison.

11.     The federal prosecutors apparently felt that, given the evidentiary destruction and obstruction of justice, that it would be difficult to convict Nettleton for murder given the beyond a reasonable doubt standard, instead opting to bring charges they knew they could meet the burden of proof.

12.     However, the burden in a civil wrongful death case is a preponderance of the evidence, which simply means that Plaintiffs have to prove that Nettleton's culpability is more likely than not.

13.     Plaintiff now accuses defendant John Nettleton of intentionally and/or recklessly and/or negligently causing the death of Christopher Tur and brings claims for wrongful death, survival, assault and battery, intentional infliction of emotional distress, failure to render aid, and tortious interference with a dead body.

14.     Plaintiff also accuses defendant Lara Sabanosh and Kelly Wirfel of intentional infliction of emotional distress and related causes of action. Wirfel was a public affairs officer at the base, who was a friend of Lara Sabanosh, who misled investigators about what happened and provided dubious information to the public about Tur's death to point the finger away from Nettleton. Sabanosh propagated false stories about her husband to point the finger away from Nettleton and away from herself.

15.     Plaintiffs also bring a claim against Sabanosh and Wirfel for third-party spoliation given their role in assisting Nettleton destroy evidence, hide the adultery, and otherwise cover up Nettleton's role in the death of Christopher Tur. Sabanosh invoked her Fifth Amendment right against self-incrimination in front of a grand jury, and has also admitted that she lied to federal investigators. Incredibly, the Navy still employs both her and Wirfel.

*****

## FACTUAL BACKGROUND LEARNED FROM INDICTMENT AND TRIAL

16.     Naval Station Guantanamo Bay ("GTMO") is part of the Navy Region Southeast ("NRSE"), which is based at Naval Air Station Jacksonville, located in Jacksonville, Florida. As the Commander of GTMO, the Defendant reported to the Commander of the Navy Region Southeast ("CNRSE") and the members of the command staff. In January 2015, the CNRSE was Rear Admiral Mary Jackson and her Chief of Staff was Captain Christopher Gray. See Indictment, United States v. Nettleton , No. 19CR00001, (Fla. M. D. Jan. 8, 2019)

17.     In or about May 2011, Christopher M. Tur ("Tur") and his family, which consisted of his wife Lara Tur, now Lara Sabanosh (Tur's Spouse or Lara Tur) and two children, moved to GTMO, where Tur had obtained a position as a civilian employee of the Navy. Tur was employed as the Loss Prevention Safety Manager at the Navy Exchange, a general store serving the GTMO community.

18.     John R. Nettleton ("Nettleton") was a Captain in the United States Navy ("Navy"). Nettleton was named the Commanding Officer ("Commander") of the Naval Station Guantanamo Bay ("GTMO") at Guantanamo Bay, Cuba in or about June 2012.

19.     Christopher Tur went missing and died shortly after an altercation with Nettleton at Nettleton's home on January 9, 2015. It is presumed that the altercation was regarding Christopher's accusation that Nettleton was engaged in an extramarital affair with Lara Sabanosh.

20.     On January 11, 2015, the U.S. Coast Guard found Christopher Tur dead in the waters of Guantanamo Bay. *Id*. at ¶ 4.

21.     Below are dates of specific incidents at issue, and Nettleton's cover up and destruction of evidence:

**January 9, 2015**

22.     On January 9, 2015 there was a "Hail and Farewell" party at the "Hanger Bar" in the basement of the GTMO Officer's Club, which is known as the "Bayview," to greet the new incoming GTMO Executive Officer ("XO"), and to say goodbye to the outgoing XO.

23.     According to many accounts, Nettleton, Tur, and Tur's Spouse each consumed a significant amount of alcohol at the Hail and Farewell, and Nettleton and Tur's Spouse spent time near each other, which was described as "very inappropriate," in view of other guests, including Tur. *Id*. at ¶ 16 & 17. This included inappropriate physical touching.

24.     Statements were made by Nettleton and Lara Tur to the effect that they did not care who knew about their affair and that they wanted everyone to know. (Even after Chris Tur's body was found, Nettleton later told Lara that once the dust settled, they would be together.)

25.     At approximately 10:00 p.m., outside the Bayview, Tur yelled at Nettleton and Tur's Spouse, accusing them of having an extramarital affair. The new XO, Commander Alonza Ross, interceded and told Nettleton to go home, located at "Deer Point" a short distance away from Bayview. Nettleton had also been trying to invite people back to his house for more drinks, including Lara Tur, which the XO prevented. Tur allegedly started walking in the opposite direction toward his own house.

26.     After the verbal argument in front of the Bayview, Lara Tur and her friend Kelly Wirfel were waiting for a ride to pick them up and take them to Wirfel's house for the night. Wirfel was a friend of the Turs. She is a civilian resident of GTMO who was the public affairs officer. Lara Tur in fact spent the night at Wirfel's house.

27.     Shortly after Nettleton returned home, Chris Tur arrived and continued the accusations. The altercation between Tur and Nettleton vacillated between conversation, confrontation and violence.

28.     Nettleton's daughter, who was home at the time, was texting with a friend. Her text messages establish a timeline of what happened.

29.     She texted at 10:22 pm that her dad was drunkenly arguing with a man, and that the man was accusing Nettleton of having an affair with his wife.

30.     She texted at 10:46 pm that the dogs were barking because someone was outside.

31.     Tur was last heard from on January 9, 2015 between 10:30 p.m. and 10:45 p.m. when he made a phone call to Kelly Wirfel, a civilian resident of GTMO who was the public affairs officer. Wirfel claims she was still at the Bayview with Lara Tur when she got the call, and that Chris Tur stated words to the effect that he was "at the Skipper's house" and that he had "just knocked the Skipper out."

32.     Kelly Wirfel also heard Nettleton stating words to the effect that Tur had "just knocked him out." After that phone call Tur was never heard from again.

33.     Wirfel nonsensically claims she thought Nettleton and Tur were playing a joke on her and messing with her. She also falsely maintains that she did not tell Lara Tur about the call at this time.

34.     Given that Wirfel had witnessed a verbal argument at the Bayview between Nettleton and Chris Tur, and Chris Tur was accusing of Nettleton of having sex with his wife, and that both were intoxicated, Wirfel has not explained what legitimate bases she had for thinking the phone call was a joke.

35.     Wirfel also claims, despite maintaining she thought the call was a joke, that she called the Executive Officer, then-Commander Alonza Ross, that night to tell him about the phone call. Ross did not pick up.

36.     As explained below, Wirfel and Lara Tur's version of events are highly implausible.

37.     At 10:55 pm Nettleton's daughter texted again that she had gone downstairs at some point in the previous few minutes and saw her dad lying on the floor with a man (Chris Tur) standing over her dad while Tur was on the phone.

38.     At 10:56 Nettleton's daughter sent another text telling another friend that there had been a fight downstairs.

39.     At 10:57 pm Nettleton's daughter sent a text to the first friend, stating "now I can hear them fighting really loudly" indicating that Nettleton and Tur were engaged in ***another*** physical confrontation.

40.     At no point did defendant Nettleton call the authorities while Tur was at his house.

41.     During this second physical altercation, Nettleton caused to Chris Tur four broken ribs, a deep laceration above his eye, and contusions on his skull. Chris Tur's blood was scattered all over Nettleton's house. Nettleton suffered no apparent injuries.

42.     At 11:22 pm Nettleton's daughter, who was upstairs during this time, first stated to her friend that she had had her brother call Nettleton's phone 6 times, but that Nettleton had not picked up. However, she did state that she heard Nettleton answer a phone call at around this time.

43.     At 11:27 pm she then texted the second friend and recapped that Nettleton and Tur had been "fighting for a while" and that she thought they had stopped "because it's quiet again."

44.     The text messages establish two periods of physical altercations. The first when Tur allegedly hit Nettleton and then called Wirfel, and then a few minutes later where the altercation escalated, became "really loud," and Nettleton severely injured Tur.

45.     Nettleton's daughter maintains that at some point after the fighting stopped, after 11:32 pm, Nettleton entered her room without a shirt on and without any apparent physical injuries.

46.     It is alleged that, following the altercation, either by coercion, deceit, or physical force, Nettleton took the injured Tur to the water, and caused him to be drowned knowing that his body would wash out to sea and likely never be found.

47.     Following Tur's killing, Nettleton then cleaned up and destroyed as much physical evidence as possible inside his house.

48.     Nettleton also attempted to sell his boat which was docked at the pier the night Tur disappeared, and the boat was also extensively cleaned.

49.     A heavy pepper mill from the residence also disappeared during the investigation, and almost all of Tur's blood was cleaned up by Nettleton.

50.     Nettleton, however, missed several droplets of Tur's blood on the underside of a ladder stair, as well as throughout the house.

51.    The presence of blood on the underside of the ladder stair indicates that Tur was on the ground and it splattered upwards as he was beaten by Nettleton.

**The Morning of January 10, 2015**

52.    Early in the morning of Saturday, January 10, 2015, at around 6:00 am Kelly Wirfel began to look for Chris Tur. Wirfel claims she was worried because she called Tur at 6:00 am and could not reach him, although his cell phone rang. Wirfel then enlisted a friend of the Turs, Randy Barger, in the search as well and told him about the phone call.

53.    Wirfel has never explained, if she thought the phone call the night prior was a joke, why she woke up at 6:00 am on a Saturday to call and look for Chris Tur—especially when she knew he had been drunk the night before and he could have been asleep.

54.    Bizarrely, Wirfel claims that although she was with Lara Tur, that she did not tell Lara Tur about the phone call she received from Lara's husband Chris—despite Chris claiming to have knocked out Lara's lover (who was the base commander) a short distance away. XO Ross maintains that Wirfel and Lara were sitting together after the verbal altercation, waiting for their ride.

55.    Even more bizarrely, Wirfel also dubiously claims that when she woke up the morning of Jan. 10, 2015, she never told defendant Lara Sabanosh, who was present at her house, about the phone call or that she was leaving to look for Chris. Lara was awake when Kelly Wirfel left.

56.    The fact that Chris Tur had called Wirfel and said that he was in a physical altercation with the commander of the entire base *about an affair Lara had with the commander* is highly explosive information. There is no chance that Wirfel and Lara would not have discussed the phone call either the prior night or that morning, especially given that Wirfel was concerned enough to look for Chris.

57.    After Wirfel picked up Barger and searched more, Wirfel and Barger went to Nettleton's house. Wirfel and Barger said that Chris had not come home and was missing.

58.    Nettleton said he had not seen Tur, the first in an ever changing series of lies. After being informed that Tur had called Kelly Wirfel on Friday night to say he was at Nettleton's residence, Nettleton said that Tur had come by and that they had verbally argued but that Nettleton asked Tur to leave and Tur did. *Id.* at ¶ 29. Wirfel did not press Nettleton on the alleged phone call or that a physical altercation had apparently occurred.

59.     Barger, however, did ask Nettleton permission to search Nettleton's backyard to look for Chris Tur. ***Nettleton shockingly denied that request***.

60.     Nettleton and Wirfel made plans to meet later in the day at Nettleton's office to discuss a search for Chris Tur.

61.     Wirfel, at around this time, then spoke with XO Ross and asked if he had heard that Tur had said anything about wanting to hit Nettleton. Ross spoke with Nettleton within a few minutes of speaking to Wirfel, and Nettleton did not relate being attacked by Chris Tur. Ross therefore did not believe, at that time, that anything had actually happened at Nettleton's house.

62.     Wirfel also vaguely claims that the first time she told Lara Tur about Chris's phone call was in the late morning on January 10, 2015. Lara Tur, however, denies that Wirfel ever told her about the phone call. Again, it is not possible that Kelly Wirfel and Lara Tur did not discuss the phone call, especially as it became clear that Chris Tur was actually missing and that Lara Tur was at the very middle of the disaster.

63.     Wirfel and Lara's changing stories, evolving excuses, and misleading actions and omissions—described throughout this complaint—stretch credulity to its breaking point.

64.     Wirfel did not share with anyone else at this time, including her superiors, that Nettleton and Christopher Tur had fought at Nettleton's house, nor that Nettleton and Lara Tur were having an affair. Wirfel has bafflingly stated that it was not a "huge concern" to tell anyone about the phone call, and maintains she still thought it was a joke even as it became clear Chris Tur was actually missing.

65.     Despite Wirfel being involved in the search for Tur, and present at meetings regarding the search, Wirfel never further mentioned the phone call she received from Chris Tur on which she also claims she heard John Nettleton's voice. Wirfel had evidence of an altercation the night Chris Tur disappeared, and also knew that Tur was at Nettleton's residence; instead she misled and remained silent, including about the illegal affair.

66.     When asked why Wirfel did not tell anyone about the phone call she implausibly maintained that in addition to thinking it was a joke, she did not want Chris to lose his job if she reported a fight with the base commander. Yet, even after Chris was found dead, Wirfel maintained her silence until approached by investigators from NCIS—by which point huge amounts of evidence were already lost.

67.     On Nettleton's part, his failure to disclose the massive physical confrontation resulting from his affair with Tur's wife was a huge, glaring omission—as was Wirfel's silence. Nettleton was the boss of one of the United States' most important military bases. That he was involved in an altercation the night his subordinate disappeared, because Nettleton was illegally having sex with the subordinate's wife, is explosive information.

68.     John Nettleton, Lara Tur, and Kelly Wirfel withheld the information, misled the investigation, and feigned ignorance about what happened the night of January 9, 2015, as this complaint describes.

**The Afternoon of January 10, 2015**

69.     At around 1 pm, Wirfel, Barger, Lara Tur, Nettleton had a meeting at Nettleton's office. The meeting concerned convening a search to look for Chris Tur.

70.     At this meeting, Lara Tur was "nonchalant" and commented "I hope we never find him."

71.     At no point did anyone, including Wirfel, Nettleton, or Lara Tur, talk about the phone call from Chris Tur to Wirfel or a physical altercation at Nettleton's house when talking about where Chris Tur could be.

72.     Instead, they agreed to claim that Chris Tur was suicidal, a fact that all three knew to be false.

73.     As a result of that meeting, with Wirfel and Lara Tur present, Nettleton spoke with the Command Duty Officer (CDO) for GTMO, at the time Anthony Thibodeaux, and instructed him to have the GTMO Security Department begin searching for Tur to the East, North, and South of the Bayview—away from Nettleton's house where Nettleton, Wirfel, and Lara Tur all knew Chris Tur had been.

74.     At or around this time, it is believed that Nettleton, Wirfel, and Lara Tur communicated about the situation, conspired to redirect the search to the wrong places, conspired to put out false information what happened, and conspired to delete and destroy evidence. The three did this to point the finger away from Nettleton's house, point the finger away from Lara and Nettleton, and to make it harder to uncover what really happened that night.

75. This began Nettleton's delicate dance of showing the required amount of concern for a missing subordinate, without taking any action which would uncover what had actually happened.

76. Nettleton therefore misled the CDO by concealing from him that on or about January 9, 2015, Tur had accused Nettleton outside of the Bayview of having an extramarital affair with Tur's Spouse, that Tur had later come to Nettleton's residence after the party, that Tur and Nettleton had engaged in a physical altercation that left Tur injured, and that Nettleton knew the last place Tur had been seen by anyone was Nettleton's residence, not the Bayview.

77. Instead, when asked by CDO Thibodeaux where to search, Nettleton said the last place Tur had been located was the Bayview. *Id.* at ¶ 30. Based on Nettleton's order and the information Nettleton provided, CDO took steps to arrange for the GTMO Security Department and other GTMO personnel to begin searching for Tur.

78. As a result of Nettleton's concealment of all relevant facts from CDO, the search for Tur started at the Bayview and was focused on areas north, south, and east of it, but not west towards Nettleton's residence, where Tur had actually last been seen by Nettleton.

79. Nettleton's house and the Bayview are very close, only being around 1,000 feet apart. Had Nettleton been truthful, the search area would have been immediately confined to a small area where Tur had been physically injured by Nettleton.

80. At no point did Kelly Wirfel and Lara Tur take any action to correct Nettleton or redirect the search.

81. Without information about Tur's accusations at the Bayview on Friday night or his appearance at Nettleton's residence and the physical altercation there, CID investigators did not question Nettleton, Wirfel, or Lara Tur on Saturday, or take other steps to focus their missing person investigation on Tur's presence at Nettleton's residence and Nettleton's knowledge of the circumstances surrounding Tur's disappearance.

82. At approximately 5:00 p.m. on or about January 10, 2015, Nettleton spoke with XO Ross and instructed him to have the entire Command Duty Office, a larger group of GTMO personnel than what is available in the GTMO Security Department, enlisted in the search for Tur.

83. However, Nettleton misled XO Ross by concealing from him that Tur came to Nettleton's residence after the Hail and Farewell party ended and they engaged in a physical altercation inside the residence that left Tur injured. Id. at ¶ 35.

84.     At approximately 8:00 p.m. on or about January 10, 2015, Nettleton approved a "Navy Blue" message be sent. The draft of the Navy Blue provided information about Tur, his disappearance, and the search for him.

85.     In a category marked, "LOCATION OF INCIDENT," the answer provided was "BAYVIEW COMPLEX." As part of the summary of the event, the notice stated, "VICTIM LAST SEEN LEAVING BAYVIEW COMPLEX AT 0030 EST."

86.     At no point on or about January 10, 2015, did Nettleton inform Admiral Mary Jackson or any of his superior officers or subordinates that on or about January 9, 2015, Tur had accused Nettleton outside of the Bayview of having an extramarital affair with Tur's Spouse, that Tur had later come to Nettleton's residence after the party, that Tur and Nettleton had engaged in a physical altercation that left Tur injured, and that Nettleton knew the last place Tur had been seen by anyone was Nettleton's residence. Id. at ¶ 41.

**January 11, 2015 - Tur's Body Discovered**

87.      On the morning of January 11, 2015, XO Ross asked Nettleton for permission to request that the U.S. Coast Guard use a helicopter to assist in the search for Tur. Unconscionably, Nettleton refused that request and was upset and shaken that Ross had taken preparatory steps to use a helicopter in the search. Ross was disturbed by the denial and Nettleton's reaction.

88.     It must be noted that Nettleton is a former helicopter pilot who knows the value of an aerial search in open areas such as the stretches of water the Coast Guard would have covered.

89.     His refusal to allow for an aerial search indicates that Nettleton already knew that Tur's body was in the water. This refusal to allow a helicopter search must also be considered in light of Nettleton's prior refusal to let Barger search Nettleton's backyard, the physical evidence discovered on Nettleton's property later on January 11, 2015, and Nettleton's attempts to downplay the physical evidence.

90.     Given that Guantanamo Bay is a small place, with few places on land for a body not to be uncovered quickly, this too indicates knowledge on Nettleton's part that Tur was dead and that his body was in the water.

91.     That same morning Nettleton spoke with Admiral Jackson on the phone with XO Ross present. Nettleton provided Admiral Jackson with information about the search for Tur. During the call, XO Ross prompted Nettleton to tell Admiral Jackson about what had happened at the Bayview between Nettleton and Tur on or about January 9, 2015, but Nettleton did not.

92.     After the call ended, XO Ross asked Nettleton why he had not told Admiral Jackson about the events at the Bayview on January 9, and Nettleton replied that Admiral Jackson "did not need to know" those facts. XO Ross then asked Nettleton if Tur had in fact come to Nettleton's house that night. Nettleton falsely stated that Tur had not. *Id*. at ¶ 45 & 46.

93.     At approximately 9:00 am on January 11, 2015, the body of Christopher Tur was found in the waters of Guantanamo Bay. *Id*. at ¶ 47. The body was decomposing due to the passage of time, which destroyed physical evidence that would otherwise have been present.

94.     At approximately 1:00 p.m. on or about January 11, 2015, persons who were still searching for Tur, unaware that his body had been located, discovered a paper towel, with a reddish-brown stain on it, near the base of a pier on or directly adjacent to Nettleton's property. The stain was determined to be Tur's blood.

95.     Nettleton had a boat at the pier, which Nettleton cleaned and tried to sell just days after Tur disappeared.

96.     Damningly, when the towel was found with what was evidently blood on it by a searcher, ***Nettleton tried to claim it was nothing and should be ignored***.

97.     At around noon on Sunday morning, NCIS interviewed Lara Tur as Chris Tur's wife to see if they could glean any information on what had happened and Chris's whereabouts. At this point, Lara did not know that Chris's body had been found. NCIS asked Lara Tur if she had a sexual relationship with Nettleton; Lara Tur lied to them and said she did not. Lara also withheld that she knew Chris Tur had called Kelly Wirfel that night and was at Nettleton's house.

98.     After Tur's body was found Nettleton was instructed by his superiors to give any information he had gathered to NCIS because Tur's death made the investigation a potential criminal matter. At approximately 4:30 p.m. Nettleton spoke with Admiral Jackson about the recovery of Tur's body. Nettleton incorrectly informed her that Tur's body had indications of possible "marine bites," but no other apparent injuries.

99.     During this conversation, Nettleton again misled Admiral Jackson by continuing to conceal information from her about Nettleton's interactions with Tur at the Bayview and at Nettleton's residence on or about January 9, 2015, including that Nettleton had been in a physical altercation with Tur in which Tur was injured. *Id*. at ¶ 49.

100.     Lara Tur also concealed the altercation, as did Kelly Wirfel.

101.    It should be noted that Tur's cell phone was never found, even though it was ringing the day after he disappeared. The last location of Tur's phone was Nettleton's house, where he had called Wirfel late on January 9, 2015. Nettleton destroyed the phone as part of the cover up.

102.    Further, the clothes Nettleton was wearing were discarded by Nettleton and never found.

**January 12, 2015**

103.    On or about January 12, 2015, Nettleton told XO Ross that Tur had come to Nettleton's residence on or about January 9, 2015, contrary to what Nettleton told XO Ross earlier. Even then, Nettleton continued to mislead XO Ross by concealing from him that Nettleton had been in a physical altercation with Tur inside Nettleton's residence and that Tur had been injured during the altercation. Nettleton had in fact told XO Ross that Tur has not been inside his home. Id. at ¶ 51.

104.    The Navy Inspector General's Office then informed Admiral Jackson and Captain Gray of an anonymous complaint alleging that Nettleton and Tur's Spouse had an extramarital affair and were engaging in physical contact at the Bayview during the Hail and Farewell party on or about January 9, 2015. Id. at ¶ 5.

105.    On or about January 12, 2015, or January 13, 2015, Nettleton spoke with Captain Gray and stated that he wanted to address "crazy rumors" he had heard about Nettleton having an affair with Tur's Spouse. Nettleton stated to Captain Gray that "there's absolutely no truth to this rumor. I was not having an affair. None of this is going on."

106.    Nettleton's denial of an extramarital affair with Tur's Spouse was false because Nettleton knew that he and Tur's Spouse had engaged in an extramarital affair.

107.    Nettleton also misled Captain Gray by continuing to conceal from him what happened between Nettleton and Tur on or about January 9, 2015. Id. at ¶ 53.

108.    During this time period, Kelly Wirfel and Lara Sabanosh maintained their silence, did not tell anyone else about the phone call, about the physical altercation, nor about the affair.

109.    Wirfel previously claimed that she did not tell military police about the phone call because she thought Chris was joking and because she did not want Chris to lose his job at the Navy Exchange. However, after Chris's body was found, Wirfel still failed to go to military police or volunteer the information she had which would have dramatically and immediately focused the investigation on Nettleton and his property.

**January 13, 2015**

110.    On or about January 13, 2015, Nettleton told Admiral Jackson for the first time that Tur had gone missing on or about January 9, 2015, after attending a command event earlier in the evening, the Hail and Farewell party at the Bayview for the incoming and outgoing XOs, at which Nettleton had been present.

111.    Nettleton also said that there was a lot of drinking at this event and there had been an argument between Tur and Tur's Spouse inside the event and also in the parking lot. Nettleton omitted that he and Lara had been inappropriately intimate at the event, that they were having an affair, that Nettleton having an affair was the subject of the argument, and that Nettleton had been part of the argument.

112.    Nettleton also told Admiral Jackson for the first time that after he left the Bayview and returned to his residence alone, Tur came there and they engaged in a verbal argument, with Tur accusing Nettleton of having an extramarital affair with Tur's Spouse. Id. at ¶ 54.

113.    Nettleton reported to Admiral Jackson that Tur left his residence and went back to the Bayview. Nettleton assured Admiral Jackson that the allegations Tur made against him were untrue and falsely stated that Nettleton did not have an extramarital relationship with Tur's Spouse.

114.    Nettleton also misled Admiral Jackson by concealing from her that there was a physical altercation between Nettleton and Tur at Nettleton's house on or about January 9, 2015 and that Tur was injured in that altercation. After hearing the new information Nettleton provided, Admiral Jackson instructed Nettleton to provide this information to NCIS. Nettleton did not provide this information to NCIS. Id.

115.    Also on January 13, 2015 an autopsy was conducted on Tur's body. The autopsy revealed, among other things, that Tur drowned, but he also had ribs that were fractured with associated soft tissue damage, and those rib injuries occurred before he died. Id. at ¶ 55.

**January 14 or January 15, 2015**

116.    On or about January 14, 2015 or January 15, 2015, Nettleton's lies evolved further as he realized he would not be able to cover everything up. He told Captain Gray that during a party at the Officer's Club on or about January 9, 2015, he got into an altercation with Tur over accusations that Nettleton was having an extramarital affair with Tur's Spouse and there may have been some pushing and shoving.

117.    Nettleton said the argument settled down and everyone went their own way, but later that evening Tur showed up at his residence and again accused him of having an affair with Tur's Spouse. Nettleton said that he denied the affair to Tur and that Tur's concerns were "tamped back down." *Id*. at ¶ 56.

118.    Nettleton said they had these discussions at the front door of Nettleton's house, and Tur wanted to come in, but Nettleton would not allow Tur to do so because Nettleton's daughter was in the house. This was all false, and designed to keep Nettleton's house from being searched. Nettleton said Tur eventually left.

119.    Nettleton explained to Captain Gray that he did not inform him of these events earlier because, "I just didn't think it was particularly relevant" or "warranted being mentioned." Nettleton misled Captain Gray by concealing from him that a physical altercation had occurred with Tur inside Nettleton's house and that Tur had been injured in the altercation. *Id*.

**January 16, 2015**

120.    Tur's Spouse was interviewed by NCIS on or about January 16, 2015. During that interview, she was asked whether she had an extramarital affair with Nettleton, and she falsely denied they had such an affair. (Lara later invoked her Fifth Amendment right against self incrimination when called before a grand jury.).

121.    After the interview, Tur's Spouse spoke with Nettleton about the questions asked by NCIS. Tur's Spouse informed Nettleton of what she told NCIS and Nettleton responded, "good." Tur's Spouse, Sabanosh, told Nettleton she thought her relationship with Nettleton was, "none of their business," and Nettleton agreed. *Id*. at ¶ 56.

**January 20, 2015**

122.    Nettleton is called in for an interview with NCIS. They read him his rights and informed him he was under investigation for adultery and involvement in Christopher Tur's death. At this point, he immediately invoked his Fifth Amendment rights and refused to speak further with investigators knowing that he had already been caught telling multiple lies. When NCIS informed him they were searching his house, he tried to object to the search.

123.    Beginning on or about January 20, 2015, NCIS conducted several searches of Nettleton's home at GTMO and the surrounding property. NCIS discovered suspected bloodstains inside the first floor of Nettleton's home during these searches. Samples of these bloodstains were taken by investigators and sent to a laboratory for forensic testing. Several of the suspected

bloodstain samples were later determined through laboratory testing and analysis to contain blood that matched Tur's DNA. *Id*. at ¶ 58.

124.    Furthermore, a heavy pepper mill was missing from the residence without explanation.

125.    Much of this was not known to Plaintiffs until January 2020, during the criminal trial of John Nettleton for obstruction of justice.

126.    From on or about January, 21, 2015, when he left GTMO, to in or about November 2016, Nettleton spoke with Tur's Spouse several times. During this time, Nettleton was assigned to Naval Air Station Jacksonville.

127.    During these conversations in 2015 and 2016, Nettleton expressed concerns to Tur's Spouse about the ongoing investigation by NCIS, including expressing concerns that the extramarital affair between Nettleton and Tur's Spouse could lead to a court martial proceeding against Nettleton.

128.    Nettleton informed Tur's Spouse that if neither of them admitted they had an extramarital affair to NCIS, then he could not be found guilty of the offense of adultery in a court martial proceeding. Tur's Spouse also said that in the event there was a court martial proceeding, she would refuse to appear and provide testimony, which Nettleton said was "good to hear." *Id*. at ¶ 59.

129.    It is also believed that during this time period Nettleton and Sabanosh conspired to delete communications and evidence regarding their affair, as well as regarding Tur's death.

**January 21, 2015**

130.    On January 21, 2015, Nettleton was fired by Rear Adm. Mary Jackson, head of Navy Region Southeast, "due to loss of confidence in Nettleton's ability to command," the region said in a press release. "Due to an ongoing NCIS investigation, it is not appropriate for the Navy to provide additional details concerning the relief," the release said. Mike Andrews, spokesman for Navy Region Southwest, said he could not comment on the reasons for the Nettleton's dismissal while the NCIS investigation continues. See Navy Region Southeast Public Affairs - Naval Station Guantanamo Bay Commanding Officer Relieved, Navy.mil (2015), available at https://www.navy.mil/submit/display.asp?story_id=85277.

ADDITIONAL CONDUCT OF DEFENDANTS LARA SABANOSH AND KELLY WIRFEL

131.   While the search for Chris Tur was happening, Lara Sabanosh falsely suggested that Christopher Tur was suicidal. Wirfel and Nettleton knew that Christopher was in fact not suicidal and that the fight at Nettleton's house did not point to suicide. Nevertheless, Nettleton used the allegation that Christopher Tur was suicidal to avoid disclosing that he had brutally injured Tur in his house the night of his death, with the help and assistance of Wirfel and Sabanosh.

132.   Then, following Christopher's death, Wirfel issued a statement to the press that his death was likely a suicide. She did so despite having first-hand knowledge of the events that heavily        and        nearly        dispositively        suggested        otherwise.        <u>See</u> <u>https://www.cnn.com/2015/01/22/us/navy-gitmo-commander/index.html</u>.

133.   When plaintiffs Michael and Henry Tur visited GTMO several days after Christopher's body was found, Sabanosh engaged in an effort to slander her dead husband and claim he had committed suicide.

134.   She claimed to them that Christopher was suicidal, would steal her medication, tried to control her, and was an all-around awful person. This was prior to her affair with Nettleton being revealed on or around January 21, 2015.

135.   Bizarrely, although Michael and Henry arrived days later, when they walked into the house Michael saw an empty pill bottle of Chris Tur's medication was placed in the middle of the bedroom walkway leading to the bathroom. Sabanosh then falsely claimed that Chris had likely overdosed. In hindsight, it is apparent that Sabanosh had placed the bottle there before their arrival as a prop, as an empty bottle would not have sat in the middle of a walkway for several days without being moved.

136.   When the affair was revealed on the national news on or around January 21, 2015, Sabanosh was in Pennsylvania with Plaintiffs, who were comforting her and the children. Nettleton had his daughter message Sabanosh's daughter, asking Sabanosh to call him on a burner phone. They spoke for over an hour, with Sabanosh covering her mouth. It is now believed that they were conspiring how to make their stories consistent and cover up what happened.

137.   When Sabanosh was asked about the phone call by Plaintiffs she claimed that Nettleton was checking on her and that he told her that when the dust settled, they would be together.

138.    Subsequently, Sabanosh publicly disseminated false and outrageous statements about Christopher Tur, including allegations that he beat her, illegally took her medication, was seriously mentally ill and suicidal, was an all-around awful person, and that Christopher Tur was at fault for what had happened to him. She furthermore lied and denied having an affair, as she had done to NCIS. This was all done in an effort to point the finger away from her and Nettleton.

139.    Yet, at trial in January 2020, Sabanosh casually admitted that Christopher Tur had no history of suicidal thoughts, had never attempted suicide, and that she did not seriously think he was suicidal. This stunned Plaintiffs, as it contradicted everything that had been said since Christopher Tur died.

140.    Plaintiffs had sat silent for years being told that Christopher Tur was a different person than they knew, and that he wanted to kill himself. The trial revealed that none of this was true.

141.    As Sabanosh left the criminal trial in January 2020, she gave Plaintiffs the finger demonstrating her malice for Plaintiffs. The indictment and trial revealed that Lara Sabanosh is not credible, that she invented lies about Chris Tur to direct attention away from her public flaunting of an affair which led to her husband's death, and that she has no compunction about acting in an extreme and outrageous manner to avoid responsibility for her actions.

142.    Wirfel is also culpable. She failed to act and when she did act she acted in a way to conceal. She allowed Nettleton to lie and conceal information, as well as put out affirmative false statements she knew were likely false. Wirfel withheld information from investigation officials. The information she withheld would have led investigators to Nettleton's house Christopher sooner, and allowed valuable evidence to be destroyed. Had Wirfel told investigators what she knew about the fight and the adultery at the very beginning she would have changed the course of the investigation.

143.    While Wirfel has not been charged with any crime, she along with Nettleton and Lara Sabanosh withheld extremely vital information from investigators and hindered the investigation into the disappearance and death of Christopher Tur, resulting in the destruction of evidence.

144.    Wirfel and Lara Sabanosh have also repeatedly lied about their communications from January 9-21, 2015, regarding their knowledge that Chris Tur went to the house of John Nettleton and that there was a serious physical altercation.

ONGOING CONDUCT

145.    Despite what had happened, Nettleton and Sabanosh continued to stay in touch, conspiring to hide their relationship once they had both moved back to Florida—a relationship which was a motive for Chris Tur's killing.

146.    Nettleton was transferred almost immediately back to Jacksonville. While in Jacksonville, Nettleton and Lara repeatedly spoke about covering up the affair, covering up what had happened to Chris. During this time period, Nettleton also spoke with Kelly Wirfel and spoke about covering up the circumstances of what had happened to Chris Tur.

147.    During this time period they conversed repeatedly about what happened January 9 to make their stories consistent, they destroyed communications relevant thereto, and they conspired to offer false testimony. This occurred in Florida, and also in Duval County where Nettleton was based.

CRIMINAL CHARGES AND TRIAL

148.    As noted above, Nettleton was indicted on January 8, 2019, on ten counts, including obstruction of justice, and then tried in January 2020. It was only at these points did Plaintiffs learn about most the information in this complaint—four agonizing years after Tur's death. To their dismay, Nettleton was not court martialed but instead tried in federal court. Furthermore, the federal charges only related to Nettleton's cover up, not Christopher Tur's death.

149.    Nettleton was tried in January 2020 and convicted on one count of concealment of material facts, two counts of obstruction of justice, two counts of falsification of records, and two counts of making false statements. He was sentenced in October 2020 to 2 years in prison.

**Count I - Obstruction of Justice**

**JOHN R. NETTLETON,** did knowingly engage in misleading behavior towards another person with the intent to hinder, delay, and prevent the communication to law enforcement officers, that is, agents of the Navy Criminal Investigative Service and members of the Naval Station Guantanamo Bay's Security Department, information relating to the commission and possible commission of a federal offense, and attempted to do so by, among other things:

a. Making false and misleading statements to Navy personnel searching for Tur and investigating his disappearance and death, such as CDO A.T., that Tur was last seen at the Officer's Club/Bayview on or about January 9, 2015;

b. Making false and misleading statements to Navy personnel, such as XO A.R., that Tur had not come to NETTLETON's residence on or about January 9, 2015 after the Hail and Farewell party at the Officer's Club/Bayview;

c. Making false and misleading statements to Navy personnel, such as XO A.R., that when Tur came to NETTLETON's residence after the Hail and Farewell party on or about January 9, 2015, Tur did not come inside the residence;

d. Concealing from Navy personnel that on or about January 9, 2015, Tur came to NETTLETON's residence after the Hail and Farewell party at the Officer's Club/Bayview, NETTLETON and Tur engaged in a physical altercation inside NETTLETON's residence, and that altercation resulted in Tur being injured;

e. Refusing the request by Navy personnel to use a U.S. Coast Guard helicopter in the search for Tur;

f. Knowingly permitting a Navy Blue communication providing false information about the last known location of Tur on or about January 9, 2015 to be sent to the Navy on or about January 10, 2015;

g. Making false and misleading statements to his superior officers, Captain C.G. and Admiral M.J., orally and in written emails on or about January 10, 2015, January 11, 2015, and January 12, 2015 that the last place Tur was seen was the Officers Club/Bayview on or about January 9, 2015;

h. Concealing from his superior officers, Captain C.G. and Admiral M.J., on or about January 10, 2015 and January 11, 2015 that Tur had gone missing on or about January 9, 2015 after attending a command event earlier in the evening, the Hail and Farewell party at the Officer's Club/Bayview for the incoming and outgoing XOs, at which NETTLETON had been present, that NETTLETON and others at the party had been intoxicated, and that Tur had accused NETTLETON of having an extramarital affair with Tur's spouse in front of the Officer's Club/Bayview after the party;

i. Concealing from his superior officers, Captain C.G. and Admiral M.J., on or about January 10, 2015, January 11, 2015, and January 12, 2015 that Tur came to NETTLETON's residence on or about January 9, 2015 after the Hail and Farewell party at the Officer's Club/Bayview;

j. Concealing from his superior officers, Captain C.G. and Admiral M.J., that on or about January 9, 2015, NETTLETON and Tur engaged in a physical altercation inside NETTLETON's residence and that altercation resulted in Tur being injured;

k. Falsely stating to his superior officers, Captain C.G. and Admiral M.J., that he had not engaged in an extramarital affair with Tur's Spouse; and

l. Encouraging Tur's Spouse to conceal from Navy investigators that she and NETTLETON had engaged in an extramarital affair.

### Count II - Obstruction of Justice

**JOHN R. NETTLETON,** did corruptly obstruct, influence, and impede official proceedings, that is, the Department of the Navy investigation into the circumstances surrounding the disappearance, injury, and death of Tur, a Department of the Navy court martial, and a Federal grand jury proceeding, and attempted to do so by, among other things:

a. Making false and misleading statements to Navy personnel searching for Tur and investigating his disappearance and death, such as CDO A.T., that Tur was last seen at the Officer's Club/Bayview on or about January 9, 2015;

b. Making false and misleading statements to Navy personnel, such as XO A.R., that Tur had not come to NETTLETON's residence on or about January 9, 2015 after the Hail and Farewell party at the Officer's Club/Bayview;

c. Making false and misleading statements to Navy personnel, such as XO A.R., that when Tur came to NETTLETON's residence after the Hail and Farewell party on or about January 9, 2015, Tur did not come inside the residence;

d. Concealing from Navy personnel that on or about January 9, 2015, Tur came to NETTLETON's residence after the Hail and Farewell party at the Officer's Club/Bayview, NETTLETON and Tur engaged in a physical altercation inside NETTLETON's residence, and that altercation resulted in Tur be

e. Refusing the request by Navy personnel to use a U.S. Coast Guard helicopter in the search for Tur;

f. Knowingly permitting a Navy Blue communication providing false information about the last known location of Tur on or about January 9, 2015 to be sent to the Navy on or about January 10, 2015;

g. Making false and misleading statements to his superior officers, Captain C.G. and Admiral M.J., orally and in written emails on or about January 10, 2015, January 11, 2015, and January 12, 2015 that the last place Tur was seen was the Officer's Club/Bayview on or about January 9, 2015;

h. Concealing from his superior officers, Captain C.G. and Admiral M.J., on or about January 10, 2015 and January 11, 2015 that Tur had gone missing on or about January 9, 2015 after attending a command event earlier in the evening, the Hail and Farewell party at the Officer's Club/Bayview for the incoming and outgoing XOs, at which NETTLETON had been present, that NETTLETON and others at the party had been intoxicated, and that Tur had accused NETTLETON of having an extramarital affair with Tur's spouse in front of the Officer's Club/Bayview after the party;

i. Concealing from his superior officers, Captain C.G. and Admiral M.J., on or about January 10, 2015, January 11, 2015, and January 12, 2015 that Tur came to

NETTLETON's residence on or about January 9, 2015 after the Hail and Farewell party at the Officer's Club/Bayview;

j. Concealing from his superior officers, Captain C.G. and Admiral M.J., that on or about January 9, 2015, NETTLETON and Tur engaged in a physical altercation inside NETTLETON's residence and that altercation resulted in Tur being injured;

k. Falsely stating to his superior officers, Captain C.G. and Admiral M.J., that he had not engaged in an extramarital affair with Tur's Spouse; and

l. Encouraging Tur's Spouse to conceal from Navy investigators that she and NETTLETON had engaged in an extramarital affair.

## Count III - Concealment of Material Facts

**JOHN R. NETTLETON,** did knowingly and willfully falsify, conceal, or cover up by trick, scheme, and device, a material fact, that is, during the investigation being conducted by the Navy, defendant NETTLETON intended to falsify and conceal the facts he knew about the circumstances surrounding the disappearance, injury, and death of Tur by, among other things:

a. Making false and misleading statements to Navy personnel searching for Tur and investigating his disappearance and death, such as CDO A.T., that Tur was last seen at the Officer's Club/Bayview on or about January 9, 2015;

b. Making false and misleading statements to Navy personnel, such as XO A.R., that Tur had not come to NETTLETON's residence on or about January 9, 2015 after the Hail and Farewell party at the Officer's Club /Bayview;

c. Making false and misleading statements to Navy personnel, such as XO A.R., that when Tur came to NETTLETON's residence after the Hail and Farewell party on or about January 9, 2015, Tur did not come inside the residence;

d. Concealing from Navy personnel that on or about January 9, 2015, Tur came to NETTLETON's residence after the Hail and Farewell party at the Officer's Club/Bayview, NETTLETON and Tur engaged in a physical altercation inside NETTLETON's residence, and that altercation resulted in Tur being injured;

e. Knowingly permitting a Navy Blue communication providing false information about the last known location of Tur on or about January 9, 2015 to be sent to the Navy on or about January 10, 2015;

f. Making false and misleading statements to his superior officers, Captain C.G. and Admiral M.J., orally and in written emails on or about January 10, 2015, January 11, 2015, and January 12, 2015 that the last place Tur was seen was the Officers Club/Bayview on or about January 9, 2015;

g. Concealing from his superior officers, Captain C.G. and Admiral M.J., on or about January 10, 2015 and January 11, 2015 that Tur had gone missing on or about January 9, 2015 after attending a command event earlier in the evening, the Hail

and Farewell party at the Officer's Club/Bayview for the incoming and outgoing XOs, at which NETTLETON had been present, that NETTLETON and others at the party had been intoxicated, and that Tur had accused NETTLETON of having an extramarital affair with Tur's spouse in front of the Officer's Club/Bayview after the party;

h. Concealing from his superior officers, Captain C.G. and Admiral M.J., on or about January 10, 2015, January 11, 2015, and January 12, 2015 that Tur came to NETTLETON's residence on or about January 9, 2015 after the Hail and Farewell party at the Officer's Club/Bayview; and

i. Concealing from his superior officers, Captain C.G. and Admiral M.J., that on or about January 9, 2015, NETTLETON and Tur engaged in a physical altercation inside NETTLETON's residence and that altercation resulted in Tur being injured.

### Count V - Falsification of Records

**JOHN R. NETTLETON,** knowingly concealed, covered up, falsified, and made false entries in records and documents, that is emails to his superior officers, Admiral M.J. and Captain C.G., with the intent to impede, obstruct, and influence the investigation and proper administration of the Department of the Navy investigation into the circumstances surrounding the disappearance, injury, and death of Tur, a matter within the jurisdiction of the Department of the Navy, a department and agency of the United States.

### Count VI - False Statement

**JOHN R. NETTLETON,** willfully and knowingly made a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the Executive Branch of the Government of the United States, by stating to XO A.R. that Tur not come to NETTLETON's residence on or about January 9, 2015 after the Hail and Farewell party at the Officer's Club/Bayview. The statement and representation was false because, as NETTLETON knew, Tur had come to NETTLETON's home on or about January 9, 2015

### Count VII - False Statement

**JOHN R. NETTLETON,** willfully and knowingly made a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the Executive Branch of the Government of the United States, by stating to XO A.R. that Tur had come to NETTLETON's residence on or about January 9, 2015, but that he had not come inside. The statement and representation was false because, as NETTLETON knew, Tur had entered NETTLETON's home on or about January 9, 2015, where NETTLETON and Tur engaged in a physical altercation.

150.    Incredibly, as noted, Lara Sabanosh flipped the middle finger to the Plaintiffs as they sat in court, well aware that they are still grieving to this day.

151.    Kelly Wirfel and Lara Sabanosh were not charged with any crimes despite engaging in conduct that was in many respects identical to that of John Nettleton.

*****

## PARTIES

**MICHAEL F. TUR, individually and as Personal Representative of the Estate of CHRISTOPHER TUR, deceased**

152.    Michael Tur, the brother of Christopher Tur, is a duly appointed representative of Tur's Estate and brings claims against the Defendants in that capacity.

153.    Tur's Estate was created in Jacksonville, Florida (Duval County) and has been probated there under docket no. 16-2019-CP-001045. Letters of administration issued on May 2, 2019, and are located at BOOK 18779 PAGE 1460-1460.

154.    Michael Tur is also bringing claims in his individual capacity where indicated.

155.    Michael Tur is a citizen of the Commonwealth of Pennsylvania and resides at 236 Chatham Place, Lansdale, Pennsylvania 19446.

**ALINE M. BYRNES, individually and as Personal Representative of the Estate of CHRISTOPHER TUR, deceased**

156.    Aline Byrnes, the sister of Christopher Tur, is a duly appointed representative of Tur's Estate and brings claims against the Defendants on that basis.

157.    Tur's Estate was created in Jacksonville, Florida (Duval County) and has been probated there under docket no. 16-2019-CP-001045. Letters of administration issued on May 2, 2019, and are located at BOOK 18779 PAGE 1460-1460.

158.    Aline Byrnes is also bringing claims in her individual capacity, where indicated.

159.    Byrnes is a citizen of the Commonwealth of Pennsylvania and resides at 39 Franklin Ave., Souderton, Pennsylvania 18964.

**ANN MARIE TUR, individually**

160.    Ann Marie Tur is the mother of Christopher Tur.

161.    She is a citizen of Pennsylvania and resides at 413 Primrose Dr., Upper Gwynedd, PA 19446.

HENRY P. TUR, JR., individually

162.    Henry "Hank" Tur is the brother of Christopher Tur.

163.    He is a citizen of Pennsylvania and resides at 113 Deer Run Rd., Perkasie, PA 18944.

164.    All Plaintiffs were close with Christopher Tur, as he was their sibling and son. They were devastated not only by his death, but also by the subsequent revelations surrounding his death. The mental and emotional pain and suffering that they have endured is beyond anything any reasonable person could endure.

JOHN R. NETTLETON

165.    Captain John R. Nettleton is the former commander of Naval Station Guantanamo Bay. Until January 2015, Nettleton resided in Guantanamo Bay and was domiciled in Florida.

166.    Following his firing as Commander in January 2015 he was reassigned to administrative duty at Naval Air Station Jacksonville where he was allowed to retire in March 2019.

167.    Nettleton's current residence is unknown, but is believed to be in Jacksonville or the surrounding suburbs; he is scheduled to begin a 2-year prison sentence, at a prison to be determined, after January 15, 2021.

LARA SABANOSH

168.    Lara Sabanosh, formerly Lara Tur, is the former wife of decedent Christopher Tur.

169.    At the time of the events in question, Lara Sabanosh was a resident of Guantanamo Bay, and was domiciled in Florida. After leaving Guantanamo bay she then moved to Florida in 2015.

170.    Lara Sabanosh currently resides in Pensacola, Florida in Escambia County at 9741 Quail Hollow Blvd.

171.    She is still employed by the Navy.

**KELLY WIRFEL**

172. Kelly Wifrel was at the time of the events in question the public affairs officer at Naval Station Guantanamo Bay, a resident of Guantanamo Bay, who was domiciled in Jacksonville, Florida in Duval County.

173. She is currently the public affairs officer for Naval Station Norfolk and is now believed to be a resident of Virginia at 932 Lake Thrasher Dr., Chesapeake, VA 23320.

*****

## JURISDICTION AND VENUE

174.     Jurisdiction is appropriate in the State of Florida over all Defendants because all defendants were residents of and domiciled in the state of Florida during the events in question, because the conduct giving rise to the claims took place in part in Florida, and Nettleton and Sabanosh are currently citizens of Florida.

175.     Venue is appropriate in Duval County because the causes of action arose at least in part in Duval County, because Nettleton resided and/or worked at Naval Air Station Jacksonville until March 2019, because the criminal trial of Nettleton took place in Jacksonville and venue was already found to be proper, and because the Estate of Christopher Tur was probated in Duval County.

176.     This is an action in excess of $15,000, exclusive of interest, costs, and attorneys' fees.

177.     All potential beneficiaries for wrongful death and their relationship to the deceased, Christopher M. Tur, are identified as follows:

    a.   The Estate of Christopher M. Tur, c/o Michael Tur and Aline Byrnes as the Personal Representatives of the Estate of Christopher Tur

    b.   Savannah Sabanosh, the natural daughter of Christopher Tur, 24 years of age.

    c.   Madison Tur, the natural daughter of Christopher Tur, 20 years of age

    d.   Ann Marie Tur, the mother of Christopher Tur

    e.   Lara Sabanosh, Christopher Tur's wife at the time of death.

        i.   Lara Sabanosh is a defendant in this complaint and she should recover nothing as a beneficiary due to her unethical behavior, illegal actions, adulterous conspiracy with Christopher Tur's killer, and unclean hands.

*****

## Wrongful Death and Survival Action

178.    This lawsuit brings claims by Christopher Tur's estate for wrongful death and survival, and also causes of action brought by the Plaintiffs individually.

179.    **Wrongful Death Claims** - As a direct and proximate result of defendant Nettleton's actions and omissions, the decedent suffered severe physical injuries and drowned. Plaintiffs claim all damages allowed for wrongful death. Decedent's survivors has/have and will suffer mental and emotional pain and suffering, has/have incurred medical and financial expenses, loss of Decedent's love, affection, support, services, protection, companionship, instruction, guidance, and funeral expenses. Decedent's Estate has also suffered a loss of net accumulations, earnings, and medical and funeral expenses.

180.    **Survival Claims** - Alternatively, in the event that Defendant(s) contend that Decedent died of some cause unrelated to the injuries and drowning alleged to have been caused bv defendant Nettleton, or that the Nettleton did not drown Decedent, then Plaintiffs assert a claim for survival damages, as Decedent suffered physical and mental and emotional pain and suffering before dying that was proximately caused by Defendants.

*****

# SPOLIATION

181.    Plaintiffs further note that defendant Nettleton repeatedly lied to investigators, colleagues, and superiors, misled investigators, thwarted the search for the body of Christopher Tur, destroyed material evidence such as blood evidence, and otherwise conspired with Lara Sabanosh and Kelly Wirfel to destroy evidence, commit perjury, and cover up Nettleton's role in the death of Christopher Tur.

182.    As a result of Nettleton, Lara Sabanosh, and Kelly Wirfel's assiduous actions to lie about the circumstances of Christopher Tur's death, mislead those searching and investigating, and destroy evidence, a great deal of evidence was irretrievably lost that would have shed light on what happened to Christopher Tur.

183.    As a result of Nettleton's obstructive actions, he was convicted of one count of concealment of material facts, two counts of obstruction of justice, one count of falsification of records, and two counts of making false statements in January 2020.

184.    Not only do these convictions constitute *crimen falsi*, but they establish that spoliation inferences are warranted and necessary in this case.

*****

# CAUSES OF ACTIONS

## COUNT I - WRONGFUL DEATH - ASSAULT AND BATTERY[1]

*Michael F. Tur and Aline M. Byrnes,*
*as personal representatives for Estate of Christopher M. Tur*
*v.*
*John R. Nettleton*

185.    Plaintiffs hereby incorporate all other paragraphs of the complaint as if fully set forth here.

186.    Defendant Nettleton negligently and/or grossly negligently and/or recklessly and/or intentionally attacked Christopher Tur, against his will, with the intent to cause great bodily harm or death, or in reckless disregard of the same.

187.    Nettleton's actions caused Tur to suffer a head laceration and broken ribs.

188.    Defendant Nettleton negligently and/or grossly negligently and/or recklessly and/or intentionally caused Tur to drown knowing that his body would wash out to sea and likely never be found.

189.    At a minimum, Christopher Tur—suffering severe injuries inflicted by Nettleton, and intoxicated—was left on his own and drowned.

190.    As a direct and proximate result of the foregoing actions and omissions of defendant Nettleton, Christopher M. Tur drowned to death, while suffering from broken ribs and a head laceration inflicted upon him by Nettleton shortly before his death.

191.    As a direct and proximate result of the foregoing actions and omissions of defendant Nettleton, Christopher Tur experienced extreme pain, suffering, and mortal fear prior to dying.

192.    As a result of his death, the Estate of Christopher Tur has suffered damages including funeral expenses that have become a charge against his Estate or were paid by or on behalf of the decedent.

193.    Further, as a direct and proximate result of the aforementioned conduct of defendant Nettleton, the Estate has lost its prospective earnings and net accumulations that might have reasonably been expected but for the wrongful death, reduced to present value.

---

[1] The following causes of action, to the extent that they plead inconsistent legal and factual theories, are pled in the alternative pursuant to Rule 1.110(g).

194.    The estate and survivors are also entitled to all other damages as allowed by 768.21, Florida Statutes, including loss of support, loss of services, loss of parental companionship, and pain and suffering.

195.    At all points defendant Nettleton's conduct was "so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct."

196.    At all points defendant Nettleton had "actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage."

197.    Plaintiffs therefore request punitive damages due to the grossly negligent and/or intentional misconduct of defendant Nettleton.

WHEREFORE, Plaintiffs demand judgment against John R. Nettleton for compensatory damages, costs, interest as allowed by law, punitive damages, and for such other relief as this Court deems just and proper.

*****

COUNT II - WRONGFUL DEATH - NEGLIGENCE

*Michael F. Tur and Aline M. Byrnes,*
*as personal representatives for Estate of Christopher M. Tur*
*v.*
*John R. Nettleton*

198.    Plaintiffs hereby incorporate all other paragraphs of the complaint as if fully set forth here.

199.    Defendant Nettleton negligently and/or grossly negligently and/or recklessly caused harm to Christopher Tur with the intent to cause great bodily harm or death, or in reckless disregard of the same.

200.    Nettleton's actions caused Tur to suffer a head laceration and broken ribs.

201.    Defendant Nettleton negligently and/or grossly negligently and/or recklessly placed an alive but injured Christopher Tur in the water adjoining Nettleton's property with the intent to cause great bodily harm or death, or in reckless disregard of the same.

202.    At a minimum, Christopher Tur—suffering severe injuries inflicted by Nettleton, and intoxicated—was left on his own and drowned.

203.    As a direct and proximate result of the foregoing conduct of defendant Nettleton, Christopher M. Tur drowned to death, while suffering from broken ribs and a head laceration inflicted upon him by Nettleton shortly before his death.

204.    As a direct and proximate result of the foregoing actions and omissions of defendant Nettleton, Christopher Tur experienced extreme pain, suffering, and mortal fear prior to dying.

205.    As a result of his death, the Estate of Christopher Tur has suffered damages including funeral expenses that have become a charge against his Estate or were paid by or on behalf of the decedent.

206.    Further, as a direct and proximate result of the aforementioned conduct of defendant Nettleton, the Estate has lost its prospective earnings and net accumulations that might have reasonably been expected but for the wrongful death, reduced to present value.

207.    The estate and survivors are also entitled to all other damages as allowed by 768.21, Florida Statutes, including loss of support, loss of services, loss of parental companionship, and pain and suffering.

208.     At all points defendant Nettleton's conduct was "so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct."

209.     At all points defendant Nettleton had "actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage."

210.     Plaintiffs therefore request punitive damages due to the grossly negligent and/or intentional misconduct of defendant Nettleton.

WHEREFORE, Plaintiffs demand judgment against John R. Nettleton for compensatory damages, costs, interest as allowed by law, punitive damages, and for such other relief as this Court deems just and proper.

*****

COUNT III - WRONGFUL DEATH - NEGLIGENT FAILURE TO RENDER AID RESULTING IN WRONGFUL DEATH

*Michael F. Tur and Aline M. Byrnes,*
*as personal representatives for Estate of Christopher M. Tur*
*v.*
*John R. Nettleton*

211.     Plaintiffs hereby incorporate all other paragraphs of the complaint as if fully set forth here.

212.     Defendant Nettleton negligently and/or grossly negligently and/or recklessly caused harm to Christopher Tur with the intent to cause great bodily harm or death, or in reckless disregard of the same.

213.     Nettleton's actions caused Tur to suffer broken ribs and head lacerations.

214.     Due to the physical attack on Christopher Tur, defendant Nettleton created a situation in which Christopher Tur's life was immediately in jeopardy, especially knowing that Tur was intoxicated and near water.

215.     Since the immediate danger to Tur's life was created by defendant Nettleton's actions and omissions, defendant Nettleton had a duty to reasonably render aid to Christopher Tur.

216.     Defendant Nettleton breached his duty to render aid in the following ways:

    a.  By failing to call for emergency services to treat Christopher Tur's injuries

    b.  By failing to seek immediate medical attention for Tur following his injuries

    c.  By leaving Tur's body in the ocean knowing that his life was in jeopardy

217.     Due to the above breaches of defendant Nettleton's duty to render aid, Christopher Tur died. Had Nettleton not breached his duty, Tur would not have died.

218.     Defendant's actions were negligent and/or grossly negligent and/or reckless and/or intentional.

219.     As a result of his death, the Estate of Christopher Tur has suffered damages including funeral expenses that have become a charge against his Estate or were paid by or on behalf of the decedent.

220.     Further, as a direct and proximate result of the aforementioned conduct of defendant Nettleton, the Estate has lost its prospective net accumulations that might have reasonably been expected but for the wrongful death, reduced to present value.

221.     The estate and survivors are also entitled to all other damages as allowed by 768.21, Florida Statutes.

222.     At all points defendant Nettleton's conduct was "so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct."

223.     At all points defendant Nettleton had "actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage."

224.     Plaintiffs therefore request punitive damages due to the grossly negligent and/or intentional misconduct of defendant Nettleton.

WHEREFORE, Plaintiffs demand judgment against John R. Nettleton for compensatory damages, costs, interest as allowed by law, punitive damages, and for such other relief as this Court deems just and proper.

*****

COUNT IV - SURVIVAL ACTION FOR ASSAULT AND BATTERY

*Michael F. Tur and Aline M. Byrnes,*
*as personal representatives for Estate of Christopher M. Tur*
*v.*
*John R. Nettleton*

225.    Plaintiffs hereby incorporate all other paragraphs of the complaint as if fully set forth here.

226.    This claim is brought in the alternative if the Defendant denies that he caused Tur to drown and/or that Tur's injuries led to his death.

227.     Defendant Nettleton is alleged to have physically attacked Christopher Tur causing broken ribs and a head laceration—after conducting an affair with Chris Tur's wife and publicly flaunting the affair.

228.    Nettleton intentionally attacked Tur, striking Tur against his will, and causing him great bodily harm.

229.    Defendant Nettleton is therefore liable for assault and battery.

230.    Nettleton's actions were, in the alternative, negligent and/or reckless.

231.    As direct and proximate result of Nettleton's actions and omissions, Christopher Tur experienced a great deal of pain and suffering prior to his death, both physical and mental and emotional. He also experienced apprehension and fear of death.

232.    Plaintiffs and the Estate are entitled to any other damages authorized by 46.021, Florida Statutes.

233.    At all points defendant Nettleton's actions and omissions were  "so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct."

234.    At all points defendant Nettleton had "actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage."

235.    Plaintiffs therefore request punitive damages due to the grossly negligent and/or intentional misconduct of defendants Nettleton.

WHEREFORE, Plaintiffs demand judgment against John R. Nettleton for compensatory damages, costs, interest as allowed by law, punitive damages, and for such other relief as this Court deems just and proper.

*****

COUNT V - SURVIVAL ACTION FOR NEGLIGENCE

*Michael F. Tur and Aline M. Byrnes,*
*as personal representatives for Estate of Christopher M. Tur*
*v.*
*John R. Nettleton*

236.    Plaintiffs hereby incorporate all other paragraphs of the complaint as if fully set forth here.

237.    This claim is brought in the alternative if the Defendant denies that he caused Tur to drown and/or that Tur's injuries led to his death.

238.    Defendant Nettleton is alleged to have negligently caused Christopher Tur broken ribs and a head laceration—after conducting an affair with Chris Tur's wife and publicly flaunting the affair.

239.    Nettleton's actions were, in the alternative, negligent and/or reckless. At all points he owed a duty to Tur and breached that duty by injuring Tur.

240.    As direct and proximate result of Nettleton's actions and omissions, Christopher Tur experienced a great deal of pain and suffering prior to his death, both physical and emotional. He also experienced apprehension and fear of death.

241.    Plaintiffs and the Estate are entitled to any other damages authorized by 46.021, Florida Statutes.

242.    At all points defendant Nettleton's actions and omissions were "so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct."

243.    At all points defendant Nettleton had "actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage."

244.    Plaintiffs therefore request punitive damages due to the grossly negligent and/or intentional misconduct of defendants Nettleton.

WHEREFORE, Plaintiffs demand judgment against John R. Nettleton for compensatory damages, costs, interest as allowed by law, punitive damages, and for such other relief as this Court deems just and proper.

COUNT VI - SURVIVAL ACTION FOR NEGLIGENT FAILURE TO RENDER AID

*Michael F. Tur and Aline M. Byrnes,*
*as personal representatives for Estate of Christopher M. Tur*
*v.*
*John R. Nettleton*

245.     Plaintiffs hereby incorporate all other paragraphs of the complaint as if fully set forth here.

246.     This claim is brought in the alternative if the Defendant denies that he caused Tur to drown and/or that Tur's injuries led to his death.

247.     Defendant Nettleton negligently and/or grossly negligently and/or recklessly caused harm to Christopher Tur with the intent to cause great bodily harm or death, or in reckless disregard of the same.

248.     Nettleton's actions caused Tur to suffer broken ribs and head lacerations.

249.     Due to the physical attack on Christopher Tur, defendant Nettleton created a situation in which Christopher Tur's life was immediately in jeopardy, especially knowing that Tur was intoxicated and near water.

250.     Since the immediate danger to Tur's life was created by defendant Nettleton's actions and omissions, defendant Nettleton had a duty to reasonably render aid to Christopher Tur.

251.     Defendant Nettleton breached his duty to render aid in the following ways:

   a.  By failing to call for emergency services to treat Christopher Tur's injuries

   b.  By failing to seek immediate medical attention for Tur following his injuries

   c.  By leaving Tur's body in the ocean knowing that his life was in jeopardy

252.     Defendant's actions were negligent and/or grossly negligent and/or reckless and/or intentional.

253.     As direct and proximate result of Nettleton's actions and omissions, Christopher Tur experienced a great deal of pain and suffering prior to his death, both physical and emotional. He also experienced apprehension and fear of death.

254.     Plaintiffs and the Estate are entitled to any other damages authorized by 46.021, Florida Statutes.

255. At all points defendant Nettleton's actions and omissions were "so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct."

256. At all points defendant Nettleton had "actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage."

257. Plaintiffs therefore request punitive damages due to the grossly negligent and/or intentional misconduct of defendants Nettleton.

WHEREFORE, Plaintiffs demand judgment against John R. Nettleton for compensatory damages, costs, interest as allowed by law, punitive damages, and for such other relief as this Court deems just and proper.

*****

COUNT VII - SURVIVAL ACTION FOR INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

*Michael F. Tur and Aline M. Byrnes,*
*as personal representatives for Estate of Christopher M. Tur*
*v.*
*John R. Nettleton; Lara Sabanosh*

258.     Plaintiffs hereby incorporate all other paragraphs of the complaint as if fully set forth here.

259.     This claim is brought in the alternative if the Defendant(s) deny that they caused Tur to drown and/or that Tur's injuries led to his death.

260.     Defendant Nettleton is alleged to have caused Christopher Tur's broken ribs and a head laceration—after conducting an affair with Chris Tur's wife and publicly flaunting the affair.

261.     Nettleton, knowing that Tur was seriously injured, negligently and/or recklessly and/or intentionally failed to render aid to Tur.

262.     Nettleton is liable for intentional and negligent infliction of emotional distress not only because of the assault and battery, but also because of the affair and the public flaunting. He acted in an outrageous and extreme manner that cannot be tolerated in a civilized society.

263.     Lara Sabanosh is being sued in this count for intentional and negligent infliction of emotional distress due to her affair and her public flaunting of the affair with Nettleton. Her actions were outrageous, extreme, and intolerable in a civilized society.

264.     As direct and proximate result of Nettleton's actions and omissions, Christopher Tur experienced a great deal of pain and suffering prior to his death, both physical and mental and emotional. He also experienced apprehension and fear of death.

265.     As a direct result of defendant Lara Sabanosh's actions and omissions, Christopher Tur experienced a great deal of pain and suffering prior to his death, both physical and emotional.

266.     Plaintiffs and the Estate are entitled to any other damages authorized by 46.021, Florida Statutes.

267.     At all points defendant Nettleton and/or Sabanosh's actions and omissions were "so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct."

268.    At all points defendant Nettleton and/or Sabanosh had "actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage."

269.    Plaintiffs therefore request punitive damages due to the grossly negligent and/or intentional misconduct of defendants Nettleton and/or Sabanosh

WHEREFORE, Plaintiffs demand judgment against John R. Nettleton for compensatory damages, costs, interest as allowed by law, punitive damages, and for such other relief as this Court deems just and proper.

*****

COUNT VII - TORTIOUS INTERFERENCE WITH A DEAD BODY

*Michael F. Tur, Aline M. Byrnes, Ann Marie Tur, Henry P. Tur, Jr.*
*v.*
*John R. Nettleton*

270.    Plaintiffs hereby incorporate all other paragraphs of the complaint as if fully set forth here.

271.    Defendant Nettleton is alleged to have physically attacked Christopher Tur causing broken ribs and a head laceration and then caused him to drown knowing that his body would wash out to sea.

272.    Once defendant Nettleton caused Tur to die, he had a duty to preserve the body in such a way as to not prevent or delay the embalming, cremation or burial of Christopher Tur's body.

273.    He also had a duty not to interfere with efforts to find the body.

274.    Defendant Nettleton breached these duties by maliciously, and with great indifference to the person, property, and rights of others, placing Christopher Tur's body in the ocean to prevent discovery. Nettleton also did this to destroy physical evidence on Tur's body which could link him to Tur's death, and to provide Nettleton time to destroy evidence on his property and devise a story.

275.    Nettleton also breached these duties by interfering with the search for Tur, lying about the circumstances of Tur's disappearance, preventing helicopter searches from taking place, and actively directing searchers to locations away from Nettleton's property.

276.    As a direct and proximate result of Defendant Nettleton's actions, Christopher Tur's body was found in the ocean over 1 day later, where human corpses are not normally stored for purposes of embalming, burial, or cremation. His body was decomposing at this point and unrecognizable to one of his friends who was involved in his body's recovery.

277.    Defendant Nettleton's actions were malicious, extreme, outrageous, and caused severe mental distress to Plaintiffs, who are the siblings and mother of Christopher Tur. His actions are not tolerable in a civilized society.

278.    All Plaintiffs were close with Christopher Tur, as he was their sibling and son. They were devastated not only by his death, but also by the subsequent revelations surrounding his death.

The mental and emotional pain and suffering that they have endured is beyond anything any reasonable person could endure.

279.    At all points defendant Nettleton's conduct was "so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct."

280.    At all points defendant Nettleton had "actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage."

281.    Plaintiffs therefore request punitive damages due to the grossly negligent and/or intentional misconduct of defendant Nettleton.

WHEREFORE, Plaintiffs demand judgment against John R. Nettleton for compensatory damages, costs, interest as allowed by law, punitive damages, and for such other relief as this Court deems just and proper

*****

COUNT IX - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

*Michael F. Tur, Aline M. Byrnes, Ann Marie Tur, Henry P. Tur, Jr.*
*v.*
*John R. Nettleton; Lara Sabanosh; Kelly Wirfel*

282.     Plaintiffs hereby incorporate all other paragraphs of the complaint as if fully set forth here.

283.     Nettleton falsified the true facts of what happened to Tur the night he disappeared. Nettleton gave false statements and misinformation substantially hindering the search for Tur. Nettleton lied to Navy investigators knowing that his lie would hinder the investigation into the disappearance of Tur. When Tur's body was found Nettleton continued to lie to investigators about the events that transpired between him and Tur the night Tur disappeared. Nettleton repeatedly told investigators that the last place Tur was seen was at the Bayview, knowing that the actual last place Tur was seen was at Nettleton's home. Nettleton also failed to mention that, that same evening Tur confronted Nettleton about having an affair with his wife, and that later on in the evening Tur and Nettleton had gotten into a physical altercation.

284.     The events that Nettleton covered up were also covered up with the assistance of Lara Sabanosh and Kelly Wirfel as described throughout this complaint.

285.     By lying, Defendants effectively destroyed the investigation into the death and disappearance of Tur; because of their actions they will never have true closure.

286.     Nettleton—with the assistance of Wirfel and Sabanosh—knew, or should have known that giving false information to NCIS, XO Ross, CDO Thibodeaux, Captain Gray and Admiral Jackson would not only hinder the investigation into the disappearance and death of Tur, but would also cause serious emotional harm to Plaintiffs when revealed.

287.     Defendants knew that by concealing, misleading and lying from 2015 to present that they would harm the Plaintiffs.

288.     The false statements, and destruction of evidence, were made in a reckless disregard for the emotional harm which is certain to result from said actions.

289.     Said actions and false statements given by Nettleton were utterly intolerable in a civilized society and were extreme and outrageous.

290.     Said extreme and outrageous conduct by Defendants caused Plaintiffs to experience extreme emotional trauma and other emotional harms as the investigation of the death and

disappearance of Tur was thwarted and delayed. Said emotional trauma and damages were proximately caused by all Defendants' actions and omissions.

291.    All Plaintiffs were close with Christopher Tur, as he was their sibling and son. They were devastated not only by his death, but also by the subsequent revelations surrounding his death. The mental and emotional pain and suffering that they have endured is beyond anything any reasonable person could endure.

292.    Nettleton was convicted by of concealment of material facts, obstruction of justice, falsification of records, and making false statements in January 2020.

293.    Kelly Wirfel knew that on the night Christopher was last seen alive, the last person to see him alive was Nettleton. Wirfel knew this because Christopher called her and told her he had just gotten into an altercation with Nettleton. Wirfel also heard Nettleton in the background of said phone call saying that Christopher had hit him. When the search for Christopher began by the Bayview, Wirfel did not tell investigators that the Bayview was not Christopher's last known location. When Christopher's body was found Wirfel did not tell investigators that Nettleton and Christopher had gotten into a physical altercation. She kept that very important information to herself. While knowingly concealing information about an active death investigation Wirfel, as the public affairs official, made statements to media to the affect that Christopher's death was a suicide or maybe an accident.

294.    Wirfel knew or should have known that by not telling investigators about her call with Christopher she would be hindering the investigation. Wirfel knew or should have known that her concealment of vital information would cause serious emotional distress to the Tur family. Her actively withholding pertinent information was done in a reckless disregard for the emotional harm which is certain to result from such actions.

295.    Said actions by Wirfel were utterly intolerable in a civilized society and were extreme and outrageous.

296.    Said extreme and outrageous conduct by Wirfel caused Plaintiffs to experience extreme emotional trauma and other emotional harms as the investigation of the death and disappearance of Tur was thwarted and delayed. Said emotional trauma and damages were proximately caused by Wirfel's actions.

297.    Lara Sabanosh knew that her husband was in no way suicidal. She said so herself, she testified that she never took his threats of suicide seriously. Sabanosh lied to NCIS

investigators at least twice about her affair with Nettleton. In fact she did not admit to the affair until the grand jury proceedings. Sabanosh knew or should have known that by lying to investigators about Christopher's "suicidal tendencies" and her affair with Nettleton she was hindering the investigation into his disappearance and his death. Sabanosh's testimony consisted mostly of character assassination. She claimed that Tur was abusive, jealous, and controlling all while painting Nettleton as a hero. Sabanosh knew or should have known that her lies to NCIS and her abhorrent testimony at trial would cause serious emotional distress to the Tur family. Her actively withholding pertinent information and was done in a reckless disregard for the emotional harm which is certain to result from such actions.

298.    Sabanosh flipping the Tur family the middle finger during the criminal trial further indicates her mindset and desire to hurt the Turs.

299.    Said actions by Sabanosh were utterly intolerable in a civilized society and were extreme and outrageous.

300.    Said extreme and outrageous conduct by Sabanosh caused Plaintiffs to experience extreme emotional trauma and other emotional harms. Said emotional trauma and damages were proximately caused by Sabanosh's actions.

301.    Furthermore, all Defendants conspired to publicly present a false version of events to mislead the public about what happened. Namely, Wirfel with the assistance of Sabanosh and Nettleton, put out press statements claiming that Christopher Tur had committed suicide.

302.    These statements were not true and it was known by Defendants that Christopher Tur was not suicidal. Furthermore, Defendants knew that a serious physical altercation had occurred at Nettleton's house which nearly dispositvely militated against Tur's death being a suicide.

303.    Defendants falsely portraying Christopher Tur as suicidal, knowing that Plaintiff would see it, was an outrageous and extreme action, which directly and proximately Plaintiffs to experience extreme emotional trauma and other emotional harms.

304.    Plaintiffs were unaware that Defendants knew that Christopher Tur was not suicidal until after the criminal trial in January 2020.

305.    At all points Defendants' actions and omissions were "so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct."

306.     At all points Defendants had "actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage."

307.     Plaintiffs therefore request punitive damages due to the grossly negligent and/or intentional misconduct of defendants Nettleton and/or Sabanosh and/or Wirfel.

WHEREFORE, Plaintiffs demand judgment against John R. Nettleton and Lara Sabanosh and Kelly Wirfel for compensatory damages, costs, interest as allowed by law, punitive damages, and for such other relief as this Court deems just and proper.

*****

COUNT X - SPOLIATION

*Michael F. Tur and Aline M. Byrnes, both as personal representatives of the Estate of Christopher Tur and Individually; Ann Marie Tur, Henry P. Tur, Jr.*
*v.*
*John R. Nettleton; Lara Sabanosh; Kelly Wirfel*

308.    Plaintiffs hereby incorporate all other paragraphs of the complaint as if fully set forth here.

309.    Defendants knew as of January 9, 2015, that at a minimum a fight had occurred between Nettleton and Christopher Tur over Lara Sabanosh's adulterous affair with Nettleton.

310.    All Defendants were aware as of the night of January 9, that criminal and civil investigations would take place regarding what had happened.

311.    This knowledge became more certain as it became clear that Tur had disappeared, and then when his body was recovered.

312.    All Defendants had a duty to preserve all evidence about what happened the night of January 9, and leading up to that night.

313.    Instead, all Defendants destroyed, delayed, and misled about what happened on January 9, 2015, resulting in the loss of critical information.

314.    This loss included physical evidence in Nettleton's house and property, the ability to recover weapons used against Tur, physical evidence on Tur's body, and communications and evidence of the affair.

315.    The conspiracy to hide this evidence, and lie about what happened, continues until 2021.

316.    As a result, Plaintiffs' abilities to prove the claims in this lawsuit has been materially hurt, and all Plaintiffs have experienced severe emotional distress.

317.    At all points Defendants' actions and omissions were  "so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct."

318.    At all points Defendants had "actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage."

319.    Plaintiffs therefore request punitive damages due to the grossly negligent and/or intentional misconduct of defendants.

WHEREFORE, Plaintiffs demand judgment against John R. Nettleton and Lara Sabanosh and Kelly Wirfel for compensatory damages, costs, interest as allowed by law, punitive damages, and for such other relief as this Court deems just and proper.

*****

## COUNT XI - CIVIL CONSPIRACY

*Michael F. Tur and Aline M. Byrnes, both as personal representatives of the Estate of*
*Christopher Tur and Individually; Ann Marie Tur, Henry P. Tur, Jr.*
*v.*
*John Nettleton; Lara Sabanosh; Kelly Wirfel*

320.    Plaintiffs hereby incorporate all other paragraphs of the complaint as if fully set forth here.

321.    The elements of civil conspiracy are an agreement between two or more parties, to do an unlawful act by unlawful means, the committing of an overt act in pursuance of the conspiracy, and damages to the plaintiffs.

322.    Here, all Defendants had an agreement to illegally cover up what happened to Christopher Tur the night of January 9, 2015, by obstructing justice, lying to investigators, and destroying evidence.

323.    Defendants' lies (both affirmative and by omission) misled investigators, directed suspicions away from Nettleton and his property, delayed the recovery of Christopher Tur's body, and otherwise violated criminal and civil law.

324.    There were numerous overt acts in furtherance of the conspiracy.

325.    Specifically, Nettleton was convicted in January 2020 on six criminal counts for over acts that obstructed justice and misled investigators.

326.    Sabanosh actively lied to investigators about her affair with Nettleton and lied about Tur's last known location. Sabanosh also lied about having suicidal tendencies.

327.    As a direct and proximate result of this conspiracy Plaintiffs suffered all damages outlined in this complaint.

328.    At all points Defendants' actions and omissions were  "so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct."

329.    At all points Defendants had "actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage."

330.    Plaintiffs therefore request punitive damages due to the grossly negligent and/or intentional misconduct of defendants Nettleton and/or Sabanosh and/or Wirfel.

WHEREFORE, Plaintiffs demand judgment against John R. Nettleton and Lara Sabanosh and Kelly Wirfel for compensatory damages, costs, interest as allowed by law, punitive damages, and for such other relief as this Court deems just and proper.

*****

## <u>RELIEF REQUESTED</u>

**WHEREFORE**, Plaintiffs demand judgment in its favor and against Defendants, jointly and severally, on all counts and claims compensatory damages in an amount in excess of this court's jurisdictional limitations, thereby guaranteeing Plaintiff a jury trial, exclusive of interests and costs, and an award of punitive damages, as well as prejudgment interest, post judgment interest, delay damages, costs, and such equitable relief as the Court deems necessary; and requests that this Court determine and declare that Plaintiffs be awarded for all counts:

a. Compensatory damages, inclusive of any and all harm attributable to Defendants' actions or inaction;
b. Wrongful death damages
c. Survival actions damages
d. Punitive damages to punish the Defendants for their outrageous conduct, self-interest, and duplicitous behavior;
e. Exemplary damages to set an example for others;
f. Attorneys' fees and court costs;
g. Delay damages; and
h. Such other and further relief and/or equitable relief that this Court deems just and/or necessary.

Respectfully submitted,

By: /S/ MICHAEL WALSH
FBN: 0172138
MICHAEL WALSH, P.A.
5301 North Federal Highway, Suite 195
Boca Raton, Florida 33487
(561) 584-4939 Phone
Mwalsh5301@gmail.com
*Attorney for Plaintiff*

Francis Malofiy, Esquire
Attorney ID No.:  208494
Alfred (AJ) Fluehr, Esquire
Attorney ID No.: 316503
FRANCIS ALEXANDER, LLC
280 N. Providence Road | Suite 1
Media, PA 19063
T:  (215) 500-1000
F:  (215) 500-1005
*Law Firm / Lawyer for Plaintiff*
*Moving for Admission Pro Hac Vice*

DATE: January 7, 2021

## SPOLIATION NOTICE -- PRESERVATION OF EVIDENCE

Plaintiffs hereby demand and request that Defendants take necessary actions to ensure the preservation of all documents, records, communications, whether electronic or otherwise, items and things in their possession or control, or any entity over which any party to this action has control, or from whom any party to this action has access to, any documents, items, or things which may in any manner be relevant to or relate to the subject matter of the causes of action and/or the allegations of this complaint.

Furthermore, all Defendants are directed to preserve their social media accounts and not to remove, delete or alter any posts, messages, data, or other information whatsoever.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a 12-person jury trial.

Respectfully submitted,

By: /S/ MICHAEL WALSH
FBN: 0172138
MICHAEL WALSH, P.A.
5301 North Federal Highway, Suite 215
Boca Raton, Florida 33487
(561) 584-4939 Phone
(305) 763-3976
Mwalsh7700@gmail.com
Fdiaz4109@gmail.com
*Attorney for Plaintiff*

Francis Malofiy, Esquire
Attorney ID No.:  208494
Alfred (AJ) Fluehr, Esquire
Attorney ID No.: 316503
FRANCIS ALEXANDER, LLC
280 N. Providence Road | Suite 1
Media, PA 19063
T:  (215) 500-1000
F:  (215) 500-1005
*Law Firm / Lawyer for Plaintiff*
*Moving for Admission Pro Hac Vice*

DATE: January 7, 2021

CERTIFICATE OF SERVICE

I hereby state that a true and correct copy of the foregoing CIVIL ACTION COMPLAINT is being served pursuant to the Florida Rules on the following:

**John R. Nettleton**

**Lara Sabanosh**

**Kelly Wirfel**

Respectfully submitted,

By: /S/ MICHAEL WALSH
FBN: 0172138
MICHAEL WALSH, P.A.
5301 North Federal Highway, Suite 195
Boca Raton, Florida 33487
(561) 584-4939 Phone
Mwalsh5301@gmail.com
*Attorney for Plaintiff*

Francis Malofiy, Esquire
Attorney ID No.:  208494
Alfred (AJ) Fluehr, Esquire
Attorney ID No.: 316503
FRANCIS ALEXANDER, LLC
280 N. Providence Road | Suite 1
Media, PA 19063
T:  (215) 500-1000
F:  (215) 500-1005
*Law Firm / Lawyer for Plaintiff*
*Moving for Admission Pro Hac Vice*

DATE: January 7, 2021